**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY WREN, derivatively on behalf of IROBOT CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> GARY COHEN, GLEN D. WEINSTEIN, JULIE ZEILER, KARIAN WONG, KAREN GOLZ, RUEY-BIN KAO, MICHAEL LOPARCO, EVA MANOLIS, ANDREW MILLER, JULIAN MININBERG, and MICHELLE STACY, <br><br> Defendants, <br><br> and <br><br> IROBOT CORPORATION, <br><br> Nominal Defendant. | Case No.: 1:25-cv-06625 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Anthony Wren ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant iRobot Corporation ("iRobot" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Gary Cohen ("Cohen"), Glen D. Weinstein ("Weinstein"), Julie Zeiler ("Zeiler"), Karian Wong ("Wong"), Karen Golz ("Golz"), Ruey-Bin Kao ("Kao"), Michael Loparco ("Loparco"), Eva Manolis ("Manolis"), Andrew Miller ("Miller"), Julian Mininberg ("Mininberg"), and Michelle Stacy ("Stacy"), (collectively, the "Individual Defendants," and together with iRobot, the "Defendants") for

breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, waste

of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Cohen, Weinstein,

Zeiler, and Wong for contribution under Sections 10(b) and 21D of the Exchange Act. As for

Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon

personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding iRobot, legal

filings, news reports, securities analysts' reports and advisories about the Company, and

information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed

by iRobot's current and/or former directors and officers from January 29, 2024 through March 11,

2025, both dates inclusive (the "Relevant Period").

2.    iRobot is a Delaware corporation headquartered in Bedford, Massachusetts, which

designs, manufactures, and sells smart-home robot vacuums and mop cleaners. The Company sells

its products globally, including throughout the United States, Europe, the Middle East, Africa, and

Japan. iRobot is predominantly known for its robotic vacuum cleaner ("RVC") products, which

are sold under the "Roomba" brand name.

3.    Although iRobot's Roomba was the first RVC to achieve commercial success, the

company's performance has steadily declined over the past decade, with the exception of a

temporary boost in sales during the COVID-19 pandemic. Chinese competitors offered lower-priced alternatives, while major consumer electronics brands like Samsung and SharkNinja launched their own RVC products. As a result, iRobot's market share fell to 64% by 2016 and further declined to just 46% by 2020.

4.      Investors saw a lifeline for iRobot when the company announced its acquisition by Amazon.com, Inc. ("Amazon") in August 2022. The merger agreement between the two provided that Amazon would acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion (the "Amazon Acquisition"). In a joint press release, iRobot's then-Chief Executive Officer ("CEO") Colin Angle expressed optimism about the Amazon Acquisition, stating in part: "Amazon shares our passion for building thoughtful innovations that empower people to do more at home, and I cannot think of a better place for our team to continue our mission. I'm hugely excited to be a part of Amazon and to see what we can build together for customers in the years ahead."

5.      On January 29, 2024, however, iRobot and Amazon revealed that the companies had entered into a mutual agreement to terminate the Amazon Acquisition as the result of regulatory concerns. In the agreement, the companies stated that there was "no path to regulatory approval in the European Union." Also, reports emerged indicating that the U.S. Federal Trade Commission ("FTC") was preparing a lawsuit aimed at blocking the deal. At the same time, iRobot announced that Colin Angle would be stepping down as CEO and that the company would be laying off approximately 350 employees, or about 31% of its workforce.

6.      Despite the collapse of the Amazon Acquisition and the subsequent workforce reduction, the Company has consistently expressed confidence in its "ability to build on [its] legacy of innovation as a standalone company and to navigate this period successfully." Following the

termination of the Amazon Acquisition, iRobot announced it would implement an operational restructuring initiative (the "Restructuring Plan")—referred to at times as "iRobot Elevate"—intended to stabilize the business in the current environment. This initiative focuses on "profitability and advancing key growth initiatives to extend market share in the mid-tier and premium segments." According to the Company, the Restructuring Plan is designed to set a new strategic course for long-term, sustainable value creation.

7.      The truth emerged on March 12, 2025, when iRobot issued a press release reporting its financial results for the fourth quarter and full year 2024 (the "4Q24/FY24 Press Release"). For the quarter, the 4Q24/FY24 Press Release revealed a reported a loss of $2.06 per share on revenue of $172 million, reflecting a 44% decline compared to the same period last year. The 4Q24/FY24 Press Release also warned investors that there is no guarantee the Company's "new product launches will be successful," citing potential challenges such as "consumer demand, competition, macroeconomic conditions, and tariff policies." As a result of these uncertainties and their potential impact on financial performance, the 4Q24/FY24 Press Release acknowledged there is "substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date of the issuance of its consolidated 2024 financial statements." Additionally, the 4Q24/FY24 Press Release announced the Company would cancel its fourth-quarter and full-year 2024 earnings call and webcast and would not be issuing a financial outlook for 2025.

8.      Market analysts reacted swiftly to the 4Q24/FY24 Press Release. On March 12, 2025, for example, a *Seeking Alpha* analyst downgraded iRobot from a hold to a sell rating, citing a "bleak outlook." The analyst noted that iRobot's business had significantly deteriorated following the collapse of the Amazon Acquisition, resulting in major layoffs and mounting losses.

They further stated that fourth-quarter earnings were "disastrous, missing guidance and showing worsening gross margins due to excess inventory and lower sales volumes." The analyst expressed serious concern about the company's future, emphasizing "substantial doubts about its viability within the next 12 months, despite ongoing discussions with its primary lender," and concluded that the Company's fate largely depends on the success of its new Roomba models, which appears unlikely. That same day, *The Motley Fool*, in an article titled "Why iRobot Stock Is Crashing Today," remarked that the company's expensive "restructuring efforts -- including a 50% reduction in its workforce -- have yet yield stability."

9.     On this news, the price of the Company's stock fell $3.25 per share over the course of two trading sessions, or 51.5%, from a closing price of $6.31 per share on March 11, 2025, to close at $3.06 per share on March 13, 2025.

10.     Following the end of the Relevant Period, iRobot experienced a short squeeze—a sharp rise in its stock price driven primarily by excessive short interest rather than improvements in the company's fundamentals—in May 2025, after news broke that U.S. tariffs on European Union imports would be postponed until July 2025. Despite the temporary boost in share price, market analysts continued to express serious concerns about iRobot's financial health. For instance, on May 29, 2025, *Seeking Alpha* observed that while the Company's "[t]echnical indicators had turned bullish short-term," even though the Company's "cash burn and deteriorating financials outweigh these positives." *Seeking Alpha* added that iRobot's first quarter 2025 results revealed declining revenue, deepening losses, shrinking cash reserves, and deteriorating gross margins.

11.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to iRobot, willfully or recklessly made and/or caused the Company to make false and

misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) iRobot exaggerated the effectiveness of the Restructuring Plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) consequently, iRobot was unlikely to achieve profitable operations as an independent entity; and (3) there was, therefore, significant doubt regarding the Company's ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its former Interim CEO, its Chief Financial Officer ("CFO"), and former CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Cohen, Weinstein, Wong, and Zeiler's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

22.    Plaintiff is a current shareholder of iRobot. Plaintiff has continuously held iRobot common stock at all relevant times.

### Nominal Defendant iRobot

23.    iRobot is a Delaware corporation with its principal executive offices at 8 Crosby Drive, Bedford, Massachusetts 01730. iRobot shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "IRBT."

### Defendant Cohen

24.    Defendant Cohen has served as CEO and as a Company Director since May 2024.

25.    The Schedule 14A the Company filed with the SEC on March 31, 2025 (the "2025 Proxy Statement") stated the following about Defendant Cohen:

**Gary Cohen** has served as a director and as chief executive officer of the Company since May 2024. With more than 25 years of executive leadership and turnaround experience, Mr. Cohen has successfully driven enterprise-wide transformation and brand growth at Fortune 500 and privately held companies in both consumer and B2B segments. He has a history of leading successful turnarounds, most recently at Qualitor Automotive. As Chief Executive Officer and a member of the board from 2015 to 2022, he led a successful transformation, increasing sales and profits by approximately 100% through the design of proprietary wiper technologies, improved supply chain operations, and the implementation of an omnichannel strategy that allowed the business to scale distribution globally. Prior to Qualitor Automotive, Mr. Cohen served as Chief Executive Officer of Timex from 2011 to

2013, where he led an $800 million multi-brand business and global team of 5,000 employees, increasing sales through the development of a new advertising platform as well as a blueprint for product innovation and restructuring of its product portfolio. Earlier in his career, he held leadership roles at Energizer, Playtex and Gillette, where he acquired extensive experience in the areas of sales and marketing, product development and design, brand building, global omnichannel strategies, retail, manufacturing, supply chain and M&A transactions.

**Defendant Weinstein**

26.     Defendant Weinstein served as the Company's Interim CEO from January 2024 to May 2024. Previously, he served as the Company's Executive Vice President and Chief Legal Officer from August 2012 to January 2024.

27.     The Schedule 14A the Company filed with the SEC on April 9, 2024 (the "2024 Proxy Statement") stated the following about Defendant Weinstein:

**Glen Weinstein** was appointed interim Chief Executive Officer in January 2024. Mr. Weinstein previously served as our executive vice president and chief legal officer from August 2012 to January 2024, as our general counsel from July 2000 to August 2012, and as senior vice president from January 2005 to August 2012. He also served as our secretary from March 2004 to January 2024. Prior to joining the Company, Mr. Weinstein was with Covington & Burling LLP, a law firm in Washington, D.C. Mr. Weinstein holds a B.S. in Mechanical Engineering from MIT and a J.D. from the University of Virginia School of Law.

**Defendant Zeiler**

28.     Defendant Zeiler served as the Company's Executive Vice President and CFO from May 2020 to November 2024.

29.     The 2024 Proxy Statement stated the following about Defendant Zeiler:

**Julie Zeiler** has served as our executive vice president and chief financial officer since May 2020, overseeing the Company's financial operations, investor relations and facilities organizations. Prior to being appointed chief financial officer, Ms. Zeiler served as the Company's vice president of finance since joining the Company in January 2017. In this position, she led the Company's financial planning and analysis, and treasury functions. Prior to joining iRobot, Ms. Zeiler served in a number of senior financial leadership positions at Boston Scientific Corporation from 1996 to 2017 that included its global operations, European business and major product lines. In addition, her experience includes financial

management roles at Digital Equipment Corporation from 1987 to 1996. Ms. Zeiler holds a B.A. in Economics and English from Albion College.

**Defendant Wong**

30.     Defendant Wong has served as the Company's Executive Vice President and CFO since December 2024.

31.     The 2025 Proxy Statement stated the following about Defendant Wong:

**Karian Wong** has served as executive vice president and chief financial officer since December 2024. With more than 25 years of experience, Ms. Wong is responsible for overseeing the Company's global finance organization, including financial planning and analysis, accounting, treasury, tax, internal audit and investor relations. Ms. Wong also manages the facilities and global IT organizations. Prior to being appointed chief financial officer, Ms. Wong led iRobot's global accounting operation, most recently serving as senior vice president and principal accounting officer from February 2021 to December 2024, where she was responsible for global accounting, tax and financial reporting. She joined the Company in 2017 as vice president and chief accounting officer. Prior to joining iRobot, Ms. Wong spent almost a decade at Nuance Communications, Inc., where she held various leadership positions, including serving as vice president and controller overseeing global accounting operations, financial reporting and M&A. Earlier in her career, she served as a senior audit manager at Ernst & Young LLP. Ms. Wong holds BBA degrees in accounting and finance from the University of Arizona and was a CPA.

**Defendant Golz**

32.     Defendant Golz has served as a Company director since November 2021. She currently serves as the Chair of the Audit Committee.

33.     The 2025 Proxy Statement stated the following about Defendant Golz:

**Karen Golz** has served as a director since November 2021. Ms. Golz is a retired partner from Ernst & Young ("EY"), a public accounting firm, where she held various senior leadership positions during her tenure at the firm, including most recently as Global Vice Chair, Japan, and prior thereto, as Global Vice Chair, Professional Practice. Ms. Golz also served on EY's Global Risk Management Executive Committee, which was charged with risk management across EY's global network. Ms. Golz currently serves as senior advisor to The Boston Consulting Group's Audit and Risk Committee, a role she has held since 2017, and as a principal for K.M. Golz Associates, LLC, a consulting services company, since 2017. She also sits on the Board of Directors of the University of Illinois

Foundation. Ms. Golz is also a National Association of Corporate Directors (NACD) Board Leadership Fellow and also earned the NACD CERT Certificate in Cybersecurity Oversight from Carnegie Mellon University. She holds a B.S. in Accountancy, summa cum laude, from the University of Illinois, Urbana-Champaign and is a certified public accountant ("CPA").

**Defendant Kao**

34.     Defendant Kao served as a Company director from June 2018 to May 16, 2025.

While on the Board, he served as a member of the Compensation and Talent Committee.

35.     The 2024 Proxy Statement stated the following about Defendant Kao:

**Dr. Ruey-Bin Kao** has served as a director since June 2018. He has more than 37 years of expertise in technology, telecommunication, corporate governance, and consumer businesses. Dr. Kao has held senior leadership roles, driving revenue growth and profitability, at numerous global companies, including Telstra Corporation Ltd. ("Telstra") (Chief Executive Officer, Greater China), Applied Materials China (President, China), China Hewlett-Packard Co. Ltd (China Managing Director/General Manager of Enterprise Business), Motorola, Inc. (China Chairman / President) and AT&T Bell Laboratories (Business and Product Marketing Manager). Most recently, from January 2014 to December 2017, Dr. Kao served as the Chief Executive Officer, Greater China, at Telstra, Australia's leading telecommunications and technology company, where his management responsibilities included building strategic partnerships to enhance the company's brand, as well as developing and executing an effective growth strategy by identifying areas of potential in the rapidly evolving Greater China market. Dr. Kao was formerly a director of China Telecommunications Corporation, China National Travel Services Group Corporation Ltd. and Shenhua Group Corporation Ltd. (now known as China Energy Investment Corporation Ltd.). Dr. Kao holds a bachelor's degree in Computer Science from Tamkang University, master's degree in Computer and Information Science from the University of Delaware and a doctorate degree of Business Administration from the Hong Kong Polytechnic University.

**Defendant Loparco**

36.     Defendant Loparco has served as a Company director since August 2024. He also

serves as a member of the Compensation and Talent Committee.

37.     The 2025 Proxy Statement stated the following about Defendant Loparco:

**Michael Loparco** has served as a director since August 2024. Mr. Loparco is a seasoned consumer-focused executive with more than 25 years' experience building

and growing highly technical and cross-border manufacturing businesses. Most recently, he served as Chief Executive Officer of Symbotic Inc. in 2022, an AI and software-enabled warehouse robotics and automation company where he led the company's successful initial public offering. Prior to Symbotic, Mr. Loparco spent more than two decades at Jabil Inc., where he rose through the ranks to become Chief Executive Officer of the Electronics Manufacturing Services (EMS) segment from 2020 to 2022 with responsibility for more than $22 billion in global operations. Prior to that, he served as Chief Executive Officer of the Engineered Solutions division from 2014 to 2019. In these roles, Mr. Loparco led enterprise supply chain and operations across 25 countries with a workforce of more than 80,000 employees, and was responsible for driving growth, innovation, digital transformation, operational efficiencies, establishing technology roadmaps, transforming complex supply chains and working with sophisticated OEM/JDM partners in a diverse array of end markets including robotics, smart home appliances and broader consumer electronics. Additionally, Mr. Loparco currently serves on the boards of directors at Sanmina Corp (Nasdaq: SANM), E2IP Technologies and Illumus, and is a strategic advisor to the Israeli-Canadian based Awz Ventures.

**Defendant Manolis**

38.    Defendant Manolis has served as a Company director since July 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee.

39.    The Company's 2025 Proxy Statement stated the following about Defendant Manolis:

**Eva Manolis** has served as a director since July 2019. Ms. Manolis brings more than 30 years of product development and global ecommerce experience within the consumer technology space to the iRobot board. Ms. Manolis served in a variety of executive roles at Amazon.com, Inc. from 2005 to 2016, where she was successful in developing and growing customer adoption of technologies, products, programs and services across a variety of categories, including consumer electronics. Most recently, Ms. Manolis served as vice president of consumer shopping at Amazon.com, Inc. from 2010 to 2016 with responsibility for worldwide innovative shopping experiences, including the development of features and services for the company's mobile app and website on a global scale. Prior to that, Ms. Manolis served as vice president of web and mobile retail applications from 2008 to 2010 and vice president of global retail applications from 2005 to 2008. Ms. Manolis also founded Shutterfly, Inc. in 1999 and served as executive vice president of products, services and strategy until 2002. At Shutterfly, she was responsible for the vision, architecture, design and development of the company's website from inception to profitability. In addition to her service on the iRobot board of directors, she also currently serves on the board of directors at Fair Isaac Corporation and previously served on the board of directors at Shutterfly, Inc.

**Defendant Miller**

40.    Defendant Miller has served as a Company director since September 2016. He has also served as the Chairman of the Board since January 2024. Additionally, Defendant Miller serves as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. According to the Company's 2024 Proxy Statement, he is designated as a "Financial Expert."

41.    The 2025 Proxy Statement stated the following about Defendant Miller:

**Andrew Miller** has served as a director since September 2016 and brings critical financial leadership as well as software, cloud infrastructure and connected technologies experience to iRobot as the Company continues to grow its consumer business globally and focus on the connected home. Mr. Miller most recently served as executive vice president and chief financial officer of PTC, Inc., a provider of software technology platforms and solutions, from 2015 to 2019. At PTC, he was responsible for global finance, tax and treasury, investor relations, information technology, pricing, corporate real estate, and customer administration. From 2008 to 2015, Mr. Miller served as chief financial officer of Cepheid, a high-growth molecular diagnostics company, where he built world-class finance and information technology teams and a nationally recognized investor relations program. Mr. Miller has also served in financial leadership roles at Autodesk, MarketFirst Software, Cadence Design Systems, and Silicon Graphics. In addition to his service on the iRobot board of directors, Mr. Miller serves as a director on the board of Verint Systems (Nasdaq: VRNT), a global software and cloud provider of actionable intelligence solutions, where he is chair of the audit committee. Mr. Miller also serves on the board of Vontier Corporation (NYSE: VNT), a global industrial technology company focused on smarter transportation and mobility, where he is chair of the audit committee and a member of the compensation committee. He is also a former director of United Online, where he chaired the audit committee and served on the compensation committee. Mr. Miller holds a B.S. in Commerce with an emphasis in Accounting from Santa Clara University and was a CPA.

**Defendant Mininberg**

42.    Defendant Mininberg has served as a Company director since June 2024. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

43.    The 2025 Proxy Statement stated the following about Defendant Mininberg:

**Julien Mininberg** has served as a director since June 2024 and brings more than 30 years of experience in building market-leading multinational brands and businesses and transforming organizations and culture, as well as operating expertise and seasoned leadership skills. Mr. Mininberg most recently served as Chief Executive Officer of Helen of Troy Limited (Nasdaq: HELE), a $2 billion global consumer products company, from 2014 until his retirement in March 2024. While leading Helen of Troy, he was twice recognized by Institutional Investor magazine as the top mid-cap CEO in the Food, Beverage, Personal Care and Household Goods industry and was elected to their All-America Executive Team. He previously led Kaz, Inc., a private equity-backed provider of health care and home environment consumer solutions, through a major turnaround from 2006 to 2010, serving as its President and later as its Chief Executive Officer. Kaz was later acquired by Helen of Troy. Before joining Kaz, Mr. Mininberg spent 15 years at The Procter & Gamble Company (NYSE: PG), where he served in a variety of general management and marketing leadership positions in the United States and Latin America. Mr. Mininberg serves as an independent director of SpartanNash Company (Nasdaq: SPTN), a food solutions distributor and retailer, where he is a member of the Compensation and Nominating and Corporate Governance Committees. He has also served as the Chairman of the Board of Directors for the privately held food company Kettle Cuisine since 2024. Previously, Mr. Mininberg served as a director of Helen of Troy from 2014 until his retirement in 2024. In addition, Mr. Mininberg is a senior advisor to the private equity firm L Catterton and serves on the board of advisors for Yale School of Management. He holds a B.A. and MBA from Yale University.

**Defendant Stacy**

44.    Defendant Stacy has served as a Company director since August 2014. She serves as the Chair of the Compensation and Talent Committee and as a member of the Nominating and Corporate Governance Committee

45.    The 2025 Proxy Statement stated the following about Defendant Stacy:

**Michelle Stacy** has served as a director since August 2014. During her five-year tenure as president at Keurig Inc., a division of Keurig Green Mountain, Inc., from 2008 to 2013, the company's revenue grew from $493 million in 2008 to $4.3 billion in 2013. Prior to serving as president of Keurig, Ms. Stacy had a 25-year career at Gillette in various global leadership roles in several business lines, including Gillette Male Grooming, Oral-B, and Papermate/Waterman. Ms. Stacy has also served as lead executive director of Coravin, Inc. and a director of LCP Edge Holdco, LLC (Hydrafacial), Young Innovations Inc., Flex Pharma and Tervis Inc. Ms. Stacy currently serves on the board of Bellwether Coffee Co., Miltons

Bakery, and SkullCandy. Ms. Stacy is a recognized expert on identifying strategies to successfully build top line growth for global brands. She holds a B.S. from Dartmouth College and an M.S. in Management from J.L. Kellogg Graduate School of Management - Northwestern University, and is bilingual in French and English.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers and/or directors of iRobot and because of their ability to control the business and corporate affairs of iRobot, the Individual Defendants owed iRobot and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iRobot in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iRobot and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to iRobot and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of iRobot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of iRobot, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised iRobot's Board at all relevant times.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

52.     To discharge their duties, the officers and directors of iRobot were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of iRobot were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to iRobot's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how iRobot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of iRobot and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that iRobot's operations would comply with all applicable laws and iRobot's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to iRobot and the shareholders the duty of loyalty requiring that each favor iRobot's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of iRobot and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with iRobot, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by iRobot.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of iRobot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

60.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of iRobot and was at all times acting within the course and scope of such agency.

## IROBOT'S CODE OF BUSINESS CONDUCT AND ETHICS

62.     The Company's Code of Ethics applies to the Company's directors, officers, and employees and it seeks "to aid the Company's directors, employees and contractors in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties." Further, former CEO and Chairman of the Board, Colin Angle, stated in a signed

prefatory letter, in relevant part: "[o]ur Code is a reaffirmation of the Company's commitment to conducting its business ethically and to observing applicable laws, rules and regulations."

63.    Under the heading, "Standards of Conduct" the Code of Ethics states, "***For our Shareholders*** – we are committed to pursuing profitable growth, without taking undue risk, to exercising financial discipline in the deployment of our assets and resources, and ***to making accurate, timely, and clear disclosures in all public reports and communications***."[1]

64.    At the outset, the Code of Ethics notes that "[e]ach director, employee and contractor has a personal responsibility to ensure that his or her conduct protects and promotes both the letter of the Code and its spirit of ethical conduct."

65.    The Code of Ethics provides, under the heading "Accuracy of Records," in relevant part:

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.
>
> \*       \*       \*
>
> No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company.

66.    Under the heading "Confidentiality," the Code of Ethics states the following, in relevant part:

> "Confidential information" includes all non-public information that might be of use to competitors or harmful to the Company or its customers if disclosed. Directors, employees and contractors may not disclose or distribute the Company's confidential information, except when disclosure is authorized by the Company or required by applicable law, rule or regulation or pursuant to an applicable legal

---

[1] All emphasis herein added unless stated otherwise.

proceeding. Directors, employees and contractors shall use confidential information solely for legitimate company purposes.

67.     Under the heading "Conflicts of Interest," the Code of Ethics states the following,

in relevant part:

> In most, if not all, cases … our directors, employees and contractors must avoid situations that present a potential or actual conflict between their personal interests and the Company's interests.
>
> A "conflict of interest" occurs when a director's, employee's or contractor's personal interest interferes with the Company's interests. Conflicts of interest may arise in many situations. For example, conflicts of interest can arise when a director, employee or contractor takes an action or has an outside interest, responsibility or obligation that may make it difficult for him or her to perform the responsibilities of his or her position objectively and/or effectively in the Company's best interests.

68.     Under the heading "Compliance with Laws, Rules and Regulations," the Code of

Ethics states the following, in relevant part:

> iRobot seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations . . . No director, employee or contractor shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, employee or contractor instruct others to do so.

69.     Under the heading "Quality of Public Disclosures," the Code of Ethics states the

following, in relevant part:

> The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosures.

70.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

**IROBOT'S AUDIT COMMITTEE CHARTER**

71.     The Company's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

72.     Per the Audit Committee Charter, under the heading "General Statement of Purpose," the Audit Committee Charter outlines the Audit Committee's responsibilities, in relevant part:

> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of iRobot Corporation (the "Company") are to:
>
> - oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> - take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors;
>
> - prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;
>
> - oversee the Company's compliance with legal and regulatory requirements; and
>
> - oversee the internal audit function of the Company to ensure compliance with accounting, financial reporting, legal or other regulatory requirements.

73.    Under the heading "Responsibilities and Authority," the Audit Committee Charter

outlines, in relevant part:

**Audited Financial Statements and Annual Audits**

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditor and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "<u>Senior Accounting Executive</u>").

- The Audit Committee shall review and discuss with management . . . the Company's annual audited financial statements, including (1) all critical accounting policies and practices used or to be used by the Company, (2) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements, including any significant, non-routine transactions or judgments

- The Audit Committee must review:

    (i)    any analyses prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

    (ii)    major issues as the adequacy of the Company's internal controls and any special audit steps adopted in light of any material control deficiencies;

    (iii)    major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

    (iv)    the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

- The Audit Committee shall review and discuss with the independent auditor (outside of the presence of management) how the independent auditor plans to handle its responsibilities under the Private Securities Litigation Reform Act of

1995, and request assurance from the auditor that Section 10A of the Private Securities Litigation Reform Act of 1995 has not been implicated

- The Audit Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto . . . . includ[ing] (1) any difficulties encountered by the auditor in the course of performing its audit work, including any restrictions on the scope of its activities or its access to information, (2) any significant disagreements with management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function

\*      \*      \*

- The Audit Committee shall also review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

- As brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by SAS 61, and (3) with the independent auditor concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

74.    Under the same heading, in the subsection titled "Risk Assessment and Management," the Audit Committee Charter also states, in relevant part:

- The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

- In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee shall discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures, including periodic review of the Company's investment policy.

75.     The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.     iRobot is a Delaware corporation headquartered in Bedford, Massachusetts, which designs, manufactures, and sells smart-home robot vacuums and mop cleaners. The Company's premier product is the "Roomba" RVC product, which was the first of its kind to achieve

commercial success. The Company's products are sold all over the world, including throughout the United States, Europe, the Middle East, Africa, and Japan.

77.     Despite the Roomba's initial success, the Company has begun to see competition from Chinese competitors, who offer lower-priced alternatives, as well as major consumer brands such as Samsung and SharkNinja. As a result, the company's performance has steadily declined over the past decade, with the exception of a slight bump in sales during the COVID-19 pandemic, with a market share of 64% by 2016 and a further decline to just 46% by 2020.

78.     The Amazon Acquisition created a sense of optimism for investors in August 2022. In a joint press release announcing the Amazon Acquisition, iRobot's then-CEO Colin Angle shared that same optimism, stating in part: "Amazon shares our passion for building thoughtful innovations that empower people to do more at home, and I cannot think of a better place for our team to continue our mission. I'm hugely excited to be a part of Amazon and to see what we can build together for customers in the years ahead."

**False and Misleading Statements**

***January 29, 2024 Acquisition Termination and Restructuring Plan Press Releases***

79.     On January 29, 2024, the start of the Relevant Period, the Company issued a press release announcing the termination of the Amazon Acquisition (the "Termination Press Release"). In the Termination Press Release, Colin Angle, Founder and former CEO of iRobot, stated that, "iRobot is an innovation pioneer with a clear vision to make consumer robots a reality." He also noted, "The termination of the agreement with Amazon is disappointing, ***but iRobot now turns toward the future with a focus and commitment to continue building thoughtful robots and intelligent home innovations that make life better, and that our customers around the world love***."

80.    On that same day, iRobot issued another press release with the title "iRobot Announces Operational Restructuring Plan to Position Company for the Future" (the "Restructuring Press Release"). The Restructuring Press Release stated, in relevant part:

> Today, iRobot [. . .] announced that it will implement an operational restructuring plan designed to position the Company for stabilization in the current environment, while focusing on profitability and advancing key growth initiatives to extend its market share in the mid-tier and premium segments. This plan was approved following iRobot's and Amazon's mutual decision to terminate their previously announced merger agreement.
>
> *    *    *
>
> ***iRobot's immediate priority in undertaking the operational restructuring plan is to more closely align its cost structure with near-term revenue expectations and drive profitability***, including through following financial and strategic initiatives:
>
> - Achieving margin improvements an generating approximately $80-$100 million in savings on equivalent volumes through the execution of agreements wit joint design and contract manufacturing partners on more attractive terms that provide significant reductions in cost of goods sold;
>
> - Reducing R&D expense by approximately $20 million year-over-year through increased offshoring of non-core engineering functions to lower-cost regions;
>
> - Centralizing global marketing activities and consolidating agency expenditures to reduce sales and marketing expenses by approximately $30 million year-over-year while seeking efficiencies in demand generation activities to drive sales more cost effectively;
>
> - Rightsizing the Company's global real estate footprint through additional subleasing at its corporate headquarters and the elimination of offices and facilities in smaller, underperforming geographies; and
>
> - Focusing iRobot's product roadmap on core value drivers and pausing all work related to non-floorcare innovations, including air purification, robotic lawn mowing and education.
>
> *    *    *

*The Company will continue executing key strategic activities to support iRobot's return to profitability, including increasing its brand recognition, driving product innovation and redesigning its go-to-market strategy. Enhancements to the Company's go-to-market playbook will focus the business on iRobot's most profitable customer, geographies and channels, including its growing direct-to-consumer channel, while rebalancing the Company's spending mix between price, promotion and demand generation to optimize returns.*

Andrew Miller, Chairman of the Board said, "iRobot is a pioneer of the consumer robot field and beloved by its customers around the world. With a legacy of innovation and a foundation of creativity, the Board and I believe that iRobot can – and will – grow its presence and continue to build a cutting-edge suite of robotic floorcare solutions that help consumers make their homes easier to maintain and healthier places to live. To do this successfully, however, we must rapidly align our operating model and cost structure to our future as a standalone company. Though decisions that impact our people are difficult, we must move forward with a more sustainable business model, and a renewed focus on profitability. ***We are confident that the actions we are announcing today will enable us to chart a new strategic path for sustainable value creation***."

### February 26, 2024 4Q/FY23 Press Release

81.    On February 26, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2023 (the "4Q23/FY23 Press Release"). The 4Q23/FY23 Press Release quoted Defendant Weinstein as stating, in relevant part, "As we shared last month, we are actively implementing an operational restructuring plan designed to both stabilize the business in the current environment and advance our growth initiatives." Defendant Weinstein continued, stating:

*The plan will simplify our cost structure, create a more sustainable business model, and enable us to focus on our core value drivers. As we move forward with urgency and focus, our management team and Board are confident in iRobot's ability to build on our innovation and to navigate this period successfully as a standalone company.*

We are managing through a challenging period and making critical strategic progress that we believe will help expand and better position our business for the future. We are confident that the actions we are taking today will drive improved performance going forward.

### February 27, 2024 FY23 10-K and 4Q23 Earnings Call

28

82.     On February 27, 2024, the Company filed its annual report for the fiscal year ended December 30, 2023 (the "2023 Fiscal Year) on Form 10-K with the SEC (the "FY23 10-K). The FY23 10-K was signed by Defendants Weinstein, Miller, Zeiler, Wong, Golz, Kao, Manolis, and Stacy, and attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Weinstein and Zeiler attesting to the accuracy of the FY23 10-K and stating that "the information contained in the [FY23 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

83.     The FY23 10-K reported the Company's financial and operational results and included a description of the Restructuring Plan similar to the one discussed in the Restructuring Press Release. *Supra* ¶ 80.

84.     On the same day, the Company held an earnings call to discuss its fourth quarter 2023 and 2023 Fiscal Year financial results (the "4Q23/FY23 Earnings Call"). For the prepared remarks of the 4Q23/FY23 Earnings Call, Defendant Weinstein stated, in relevant part:

> Our future is different than we had envisioned in August of 2022 or even at the start of this year, given the decision by iRobot and Amazon to terminate our transaction. ***The management team and Board are confident in our ability to build on our legacy of innovation as a standalone company and to navigate this period successfully.***
>
> As we shared on January 29th, we are taking aggressive action to significantly improve our near-term operations. To that end, today, I'm going to outline the tenets of the restructuring plan we announced last month.
>
> \*       \*       \*
>
> The operational restructuring plan we announced last month is designed to stabilize the business in our current environment, while also advancing our longer-term growth initiatives. The operational restructuring plan is centered around simplifying our cost structure, implementing a more sustainable business model, and focusing on our core value drivers. Those core value drivers are: first, leverage our brand and innovative products to extend or reclaim our leadership in the mid and premium segments; and second, focus on geographies that offer the greatest scale and profitability.

Our immediate priorities in executing this plan are to more closely align our cost structure with near-term revenue expectations, improve liquidity and drive bottom-line improvements. Specifically, the plan is structured to: first, achieve gross margin improvements through a focus on design to value and removal of unnecessary costs and more attractive terms with our manufacturing partners; second, reduce R&D expenses by relocating certain non-core engineering functions, including increasing reliance on third-parties to provide those functions and pausing work unrelated to our core floorcare business; third, centralize our global marketing activities to be more efficient in demand generation and provide a meaningful reduction in non-working marketing and agency fees; and fourth, streamline our legal entity and real-estate footprint to fit our current business needs and near-term revenue expectations.

*      *      *

As we've outlined, we have a plan in place to simplify our cost structure, implement a more sustainable business model, and focus on our core value drivers of leveraging our brand and innovative products to regain and extend our leadership across segments and geographies. ***Coupled with the restructuring actions we announced, we believe our second half 2024 performance will serve as a springboard for our – driving our future.***

**April 9, 2024 Proxy Statement**

85.     On April 9, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

86.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendant Manolis to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve amendments to the Company's amended and restated Certificate of Incorporation ("COI") to eliminate supermajority voting requirements; (4) approve amendments to the Company's COI to declassify the Board; (5) approve amendments to the Company's COI to eliminate the prohibition on stockholders' ability to call a special meeting; (6) approve

amendments to the Company's COI to limit liability of certain officers in certain circumstances as permitted by Delaware General Corporation Law amendments; (7) approve, on an advisory basis, the compensation of the Company's named executive officers; and (8) approve an amendment to the 2018 Stock Option and Incentive Plan, (the "Amended 2018 Plan"), to increase the maximum number of shares reserved and issuable.

87.     The 2024 Proxy Statement explains that the Amended 2018 Plan would increase the aggregate number of shares authorized for issuance under the existing plan by 900,000 shares. As such, upon approval of the Amended 2018 Plan, the maximum number of shares of common stock that may be issued is 4,295,000. As of March 14, 2024, there were 363,566 shares of common stock available for grant under the plan. As such, following the approval of the Amended 2018 Plan, there would be a total of 1,263,566 shares available. The 2024 Proxy Statement noted that if the iRobot shareholders approved the Amended 2018 Plan, "[a]ll full-time and part-time officers, employees, non-employee directors and consultants are eligible to participate in the Amended 2018 Plan, subject to the discretion of the [Compensation and Talent Committee]." Further, the 2024 Proxy Statement awards "stock options (both incentive and non-qualified options), stock appreciation rights, restricted stock, restricted stock units, unrestricted stock, cash-based awards, and divided equivalent rights."

88.     Regarding "The Board of Directors' Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> The board of directors oversees our risk management process. This oversight is primarily accomplished through the board of directors' committees and management's reporting processes, including receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks. The audit committee focuses on risk related to accounting, internal controls, financial and tax reporting, privacy and cybersecurity. The audit committee also assesses economic and business risks and monitors compliance with ethical standards. The

compensation and talent committee identifies and oversees risks associated with our executive compensation policies and practices, and the nominating and corporate governance committee identifies and oversees risks associated with director independence, related party transactions and the implementation of corporate governance policies.

89.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided, in relevant part:

> We have adopted a "code of ethics," as defined by regulations promulgated under the Securities Act of 1933, as amended ("Securities Act"), and the Exchange Act, that applies to all of our directors and employees worldwide, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. A current copy of the Code of Business Conduct and Ethics is available at *https://investor.irobot.com/corporate-governance/highlights*. A copy of the Code of Business Conduct and Ethics may also be obtained, free of charge, from us upon a request directed to: iRobot Corporation, 8 Crosby Drive, Bedford, Massachusetts 01730, Attention: Investor Relations. We intend to disclose any amendment to or waiver of a provision of the Code of Business Conduct and Ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website available at https://investor.irobot.com/corporate-governance/highlights and/or in our public filings with the SEC.

90.    Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) iRobot exaggerated the effectiveness of the Restructuring Plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) consequently, iRobot was unlikely to achieve profitable operations as an independent entity; and (3) there was, therefore, significant doubt regarding the Company's ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

91.    The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of

Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92.     As a result of Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy causing the 2024 Proxy Statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendant Manolis to the Board, thereby allowing her to continue breaching here fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve amendments to the Company's COI to eliminate supermajority voting requirements; (4) approve amendments to the Company's COI to declassify the Board; (5) approve amendments to the Company's COI to eliminate the prohibition on stockholders' ability to call a special meeting; (6) approve amendments to the Company's COI to limit lability of certain officers in certain circumstances as permitted by Delaware General Corporation Law amendments; (7) approve, on an advisory basis, the compensation of the Company's named executive officers; and (8) approve the Amended 2018 Plan to increase the maximum number of shares reserved and issuable.

93.     As a result of the shareholders approving the Amended 2018 Plan, an additional 900,000 shares were made available for disbursement, allowing for a total of 4,295,000 shares. As such, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Amended 2018 Plan in the future.

***May 7, 2024 1Q24 Press Release***

94.     On May 7, 2024, iRobot issued a press release announcing its financial results for the first quarter 2024 (the "1Q24 Press Release"). The 1Q24 Press Release quoted Defendant Weinstein as having stated, "We exceeded our financial expectations for the first quarter as our team executed on our restructuring plan to significantly improve iRobot's near-term operations." Defendant Weinstein continued, stating that "Our plan is designed to stabilize the business in the current market environment without sacrificing longer-term growth initiatives. In the first quarter, we took aggressive actions to simplify our cost structure, implement a more sustainable business model and focus on our core value drivers."

### *May 8, 2024 1Q24 Earnings Call*

95.     On May 8, 2024, the Company held an earnings call to discuss its first quarter 2024 financial results (the "1Q24 Earnings Call"). For the prepared remarks of the 1Q24 Earnings Call, Defendant Weinstein stated, in relevant part:

> We took aggressive action in Q1 to implement our restructuring plan to significantly improve our near-term operations. On today's call, I'll share with you the progress we have made with key elements of the plan and discuss what you can expect from iRobot moving forward. With the successes we achieved in the first quarter, and with a new CEO in place, we are all the more confident in our iRobot's ability to build on our legacy of innovation.

> \*        \*        \*

> Operationally, Q1 represented an important first step with respect to our restructuring plan. The plan is designed to stabilize the business in the current market environment without sacrificing longer-term growth initiatives. We are committed to simplifying our cost structure, implementing a more sustainable business model and concentrating on our core value drivers. We are leveraging our brand and innovative products to extend or reclaim leadership positions in the mid and premium market segments as well as leveraging our new product launches that balance price point and cost to participate more fully in the entry market segment. In addition, we are focused on geographies that offer the greatest scale and profitability.

> \*        \*        \*

In short, we have an iconic brand that people are passionate about, and we have great products. About 5 weeks ago, consumer reports released its 2024 guide to robotic vacuums. iRobot products held all 5 top positions and 7 of the top 8 rated robots with new models coming and our focused marketing driving sales at key retailers and online we believe we are well positioned to stabilize the business. ***The first quarter represented an important step in iRobot's journey, and we are proud of the way that it was able to deliver on the promises we outlined previously.***

***August 6, 2024 2Q24 Press Release***

96.     On August 6, 2024, iRobot issued a press release announcing its financial results for the second quarter 2024 (the "2Q24 Press Release"). The 2Q24 Press Release quoted Defendant Cohen as having stated that, "We are executing iRobot elevate, a strategy focused on five pillars of financial performance, customer-centricity, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization improvements, and developing and retaining our best talent." He continued, noting that, "We are elevating everything we do at iRobot to improve our performance and generate long-term shareholder value."

97.     The 2Q24 Press Release further quoted Defendant Cohen as stating, in relevant part:

> In the second quarter, we made significant progress, specifically in lowering the Company's cost structure through aggressive restructuring efforts. As part of our iRobot Elevate strategy, we strengthened our balance sheet, narrowed our operating loss, decreased headcount, and substantially reduced inventory. Without a non-recurring charge related to the write-off of excess component inventory and the losses on non-cancelable purchase commitments as part of the transition to our new product development paradigm with our contract manufacturers, we would have met our Q2 improvement targets for gross margin, operating loss, and net loss per share.

*     *     *

> We are executing iRobot Elevate, a strategy focused on five pillars of financial performance, customer-centricity, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization

35

improvements, and developing and retaining our best talent.

***August 7, 2024 2Q24 Earnings Call***

98.    On August 7, 2024, the Company held an earnings call to discuss its second quarter 2024 financial results (the "2Q24 Earnings Call"). For the prepared remarks of the 2Q24 Earnings Call, Defendant Cohen stated, in relevant part:

> During the past three months, I have identified several inefficiencies within our business that I believe have hindered iRobot's ability to maximize the potential of our powerful technology, brand, and consumer appeal. We had a high-cost product line that is now in the process of being refreshed in order to enhance our competitiveness and improve our profitability. At the same time, we had an organizational structure with too many layers that was built for a much larger company and that slowed decision making. Additionally, the R&D model carried too much overhead in high-cost countries for too many on-core ideas.
>
> Our restructuring plan addresses all of these issues. Since I have joined, we have made several changes to our executive leadership team and reorganized the R&D to be better aligned with our vision of how to deliver new products. In fact, I am pleased to announce Jeff Engel has officially joined iRobot as President and Chief Operating Officer, reporting to me. Jeff has been with iRobot for seven months as our Chief Restructuring Officer and Advisor. He will be responsible for R&D, operations and supply chain and product management, and will continue his duties as CRO, since our work in this area is not completed.
>
> Jeff's willingness to join iRobot at this time and his faith in our turnaround speaks volumes to the company's growth prospects. And he has been instrumental in helping us deliver against our restructuring targets. Our second quarter results demonstrate that our restructuring plan is on track and delivering the expected results. We have made tough but appropriate decisions to achieve our planned operating expense and headcount reduction targets. We have also reduced inefficient marketing spend and improved our product margins via our new contract manufacturing strategy.
>
> *            *            *
>
> As we navigate near-term headwinds, we remain confident in our ability to build on iRobot's legacy of innovation to advance our long-term growth initiatives. To that end, we have launched iRobot Elevate, which is a new strategy centered on improving our financial performance, increasing consumer focus to elevate our brand, bringing innovative products to market in an entirely new and more

36

profitable way, continuing our operational and organization improvements, and developing and retaining our best talent.

*    *    *

Our near-term goal is to stabilize the business, improve the balance sheet and launch new products that set us on a path to revenue growth. I am confident in our turnaround plan, pleased with our early returns and energized by our future potential. Turnarounds are challenging, take time, energy and commitment. I have done it before, and I plan to do it again.

### November 5, 2024 3Q24 Earnings Call

99.    On November 5, 2024, the Company held an earnings call to discuss its third quarter 2024 financial results (the "3Q24 Earnings Call"). For the prepared remarks of the 3Q24 Earnings Call, Defendant Cohen stated, in relevant part:

> As we begin this new chapter in iRobot's history, one thing is abundantly clear. We have a powerful brand that will serve as the foundation for the turnaround of this company. Which should come as no surprise that in my conversations with stakeholders, it is the power of our iconic brand that comes up again and again. That brand power is at the heart of our turnaround strategy, iRobot Elevate.
>
> In executing iRobot Elevate, we are focused on providing our iconic brand with an improved platform to return to profitable growth. We are making operational and organizational changes and bringing new innovative products to market. While this work is ongoing, we are already realizing benefits and our improved financial performance. ***We recognize that turnarounds of this scale take time, but I am encouraged by our progress toward the goals that we set in February***.

*    *    *

> But even in our current turnaround, iRobot continues to be the leader in several segments and we remain confident that as we aggressively introduce new robots with more features and enhanced capabilities, our share and sales volume will rebound. And consumers remain loyal to the Roomba brand. In fact, in a recent promotion with one of our major retailers, iRobot had four of the top five SKUs in the robot vacuum cleaner category. We still have work-in front of us to become a more agile growth business, but our culture of innovation remains strong and I believe that we can achieve our growth and value creation goals. I see incredible opportunities for this company and we are optimistic about our prospects in 2025. This optimism is based on our expectations regarding the growth in the robotic floor care category as a whole, as well as success from our own new product programs.

37

\*    \*    \*

*In closing, we are mindful of the market and operational challenges ahead and believe our actions will elevate iRobot's overall performance and ultimately generate long-term growth and shareholder value*.

***November 6, 2024 3Q24 Press Release***

100.    On November 6, 2024, iRobot issued a press release announcing its financial results for the third quarter 2024 (the "3Q24 Press Release"). In the 3Q24 Press Release, Defendant Cohen stated that the Company "continue[s] to make progress on our turnaround strategy. He further stated, in relevant part:

In the third quarter, we expanded our non-GAAP gross margin by 590 basis points year over year and improved our use of operating cash. However, our overall results did not meet the expectations we set in August, as persistent market segment and competitive headwinds impacted our sell-through performance. Although we now expect it will take more time to stabilize our revenue trend, *we are on track to exceed our operating expense targets for the year, while at the same time continuing to invest in areas that are expected to drive growth*.

Our ongoing restructuring has fundamentally changed the way we innovate, develop and build our robots, which is central to improving our performance and generating long-term shareholder value. With the benefit of lower operating costs, we expect to enhance margins and improve profitability in 2025.

As we move forward in this new chapter in iRobot's history, one thing is abundantly clear: we have a powerful brand that will serve as the foundation for the turnaround of this Company. *That brand power is at the heart of our turnaround strategy, iRobot Elevate. In executing that strategy, we are focused on providing our iconic brand with an improved platform to drive long-term profitable growth*.

101.    Further, the 3Q24 Press Release provided, in relevant part:

**Fourth-Quarter and Full-Year 2024 Outlook**

iRobot is providing GAAP and non-GAAP financial expectations for the fourth quarter ending December 28, 2024 and updating the full-year 2024 outlook it provided on August 7, 2024.

\*    \*    \*

*Fourth Quarter 2024:*

| Metric | GAAP | Adjustments | Non-GAAP |
|---|---|---|---|
| Revenue | $175 – $200 million | — | $175 – $200 million |
| Gross Margin | 24% – 27% | ~0% | 24% – 27% |
| Operating Loss | ($43) – ($34) million | ~$12 million | ($31) – ($22) million |
| Net Loss Per Share | ($1.88) – ($1.58) | ~$0.38 | ($1.50) – ($1.20) |

### *January 13, 2025 4Q24 Press Release*

102.    On January 13, 2025, the Company issued a preliminary press release announcing financial results for the fourth quarter of 2024 (the "4Q24/FY24 Preliminary Press Release"). In the 4Q24/FY24 Preliminary Press Release, Defendant Cohen was quoted as stating that, "We have fundamentally changed the way we innovate, develop and build our robots, which is central to our strategy for improving financial performance and generating long-term shareholder value." Defendant Cohen continued, stating that the Company "exceeded our 2024 operating expense restructuring targets while we are investing in areas that are expected to drive growth. We remain on schedule with our product launches planned for 2025 that are designed to excite consumers with feature-rich robots and improve the consumer product experience."

103.    The 4Q24 Press Release also provided, in relevant part:

> *For the full year 2025, iRobot currently expects to return to year-over-year top-line growth as it introduces new and revitalized products. The Company expects the second half of 2025 will be stronger than the first half of the year as its product lineup ramps up.* The Company expects first-quarter 2025 results will continue to reflect a transitional period for its product line. With the benefit of lower product costs and reduced development timelines, iRobot expects enhanced margins and improved profitability in 2025. iRobot will be sharing additional details, including its outlook for 2025, on its fourth-quarter and year-end 2024 conference call.

104.    The statements referenced above in ¶¶ 79-84 and 94-103 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) iRobot exaggerated the effectiveness of the Restructuring Plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) consequently, iRobot was unlikely to achieve profitable operations as an independent entity; and (3) there was, therefore, significant doubt regarding the Company's ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

***March 12, 2025 4Q/FY24 Press Release***

105.    On March 12, 2024, the Company issued the 4Q/FY24 Press Release. The 4Q/FY24 Press Release revealed that during the fourth quarter 2024, the Company reported a loss of $2.06 per share on revenue of $172 million, representing a 44% decline year-over-year. The 4Q/FY24 Press Release also announced, in relevant part:

> As will be noted in iRobot's Annual Report on Form 10-K for the year ended December 28, 2024 (10-K), there can be no assurance that the new product launches will be successful due to potential factors, including, but not limited to consumer demand, competition, macroeconomic conditions, and tariff policies. ***Given these uncertainties and the implication they may have on the Company's financials, there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date of the issuance of its consolidated 2024 financial statements***. Additional information will be included in the 10-K that is filed with the SEC.

*    *    *

**Fourth-Quarter and Full-Year 2024 Conference Call**

In light of these developments, ***the Company has canceled its fourth-quarter and full-year 2024 results conference call and webcast***, originally scheduled for today, March 12, 2025 at 8:30 a.m. ET, ***and is not providing a 2025 outlook at this time***.

***March 12, 2025*** **Seeking Alpha** ***Analyst Report and*** **The Motley Fool** ***Article***

106.    Market Analysts reacted to this news quickly. On the same day the 4Q/FY24 Press

Release was issued, an analyst from *Seeking Alpha* released a report, stating, in relevant part:

- iRobot's business prospects have deteriorated significantly since the Amazon acquisition fell through, leading to massive layoffs and growing losses.

- Q4 earnings were disastrous, missing guidance and showing worsening gross margins due to excess inventory and lower sales volumes.

- iRobot's future is uncertain, with substantial doubts about its viability within the next 12 months, despite ongoing discussions with its primary lender.

- Downgrade to a sell rating due to bleak outlook; survival hinges on new Roombas being a hit, which seems unlikely.

*        *        *

**How Did We Get Here?**

Everything here largely starts in January 2024, when Amazon and iRobot agreed to scrap the planned buyout. It wasn't a shocking turn of events, but it did set iRobot on a plan of massive cost-cutting, with 31% cut in staff back at the time, and another 16% cut announced in November.

In Q3 it looked potentially promising. They beat by 3¢ EPS non-GAAP, actually profitable on a non-GAAP basis, though their outlook for Q4 was a loss per share between $1.20 and $1.50. In retrospect, we should be so lucky to have only lost that much.

As recently as March 11, the day before the pre-market earnings release, iRobot was sounding kind of upbeat, announcing an array of new advanced Roomba and 2-in-1 products. The 2025 line of products had some interesting features, and would go on sale later this month in North America and Europe.

**But Then Q4 Happened**

Before the market opened, and before they ultimately canceled the conference call, iRobot issued Q4 earnings. It was not pretty.

|  | Q4 2023 | Q4 2024 (guidance) | **Q4 2024 (actual)** |
|---|---|---|---|
| Revenue | $307.5 million | $171 million | $172 million |
| Gross Margins | 18.9% | 24%-27% | 9.5% |
| Operating Income | ($52.2 million) | ($22 - $31 million) | ($61 million) |
| GAAP EPS | ($2.28) | ($1.58 - $1.88) | ($2.52) |
| Non-GAAP EPS | ($1.82) | ($1.20 - $1.50) | ($2.06) |

(source: IR release from iRobot for actual earnings, Q3 report for guidance data)

As you can see, not only is the situation getting quite a bit worse year-over-year, but they missed on Q4 guidance badly, even though it was offered just a few months ago. This is a serious problem, and is presumably a big reason why iRobot decided not to offer any further outlook information for 2025.

Losses are growing, and much worse than guidance. Perhaps the biggest problem though is that the gross margins that they expected to get a little better actually got precipitously worse. Some of the drag on gross margins for Q4 2024, and for the full year figures we're about to look at are because they had to write off a lot of excess inventory, and they have existing purchase agreements that don't really make sense with the much lower volume they're selling lately.

\*       \*       \*

**Where We Go From Here**

Then the even bigger news hit, and given how bad the earnings numbers look that's really saying something. iRobot announced that they have a lot of uncertainties right now, and put together they provide a "substantial doubt" about iRobot being able to remain a going concern even within the next 12 months.

The uncertainties contain few surprises, mostly including questions about demand and growing competition, but also much bigger near-term issues like the threats posed by tariffs and macroeconomic conditions. We could be sliding into recession right now, at least according to some, and that's not a good time for a consumer robot company who is already floundering.

107.    That same day, *The Motley Fool* issued an article with the title, "Why iRobot Stock Is Crashing Today." The article stated, in relevant part:

> iRobot . . . stock has fallen 35% after the company issued a "going concern" warning, raising doubts about its ability to stay in business over the next year.
>
> \*        \*        \*
>
> **A business model under pressure**
>
> iRobot is struggling to keep up with rising competition, especially from lower-cost Chinese robotic vacuum manufacturers. These rivals offer similar or better features at reduced prices, eroding iRobot's once-dominant position.
>
> ***Meanwhile, iRobot's costly restructuring efforts -- including a 50% workforce reduction -- have yet to yield stability. The company has also been dealing with excess inventory write-offs, further damaging its margins***.
>
> \*        \*        \*
>
> In a desperate bid to regain its footing, iRobot has launched eight new Roomba models, touting lidar navigation and improved mapping technology. However, the company's financial turmoil has overshadowed this product push, leaving investors skeptical.
>
> \*        \*        \*
>
> **What's next for iRobot?**
>
> With no clear path to profitability, iRobot has hired financial advisors to explore strategic alternatives, including a potential sale or refinancing. However, it remains unclear whether these efforts will be enough to restore investor confidence.

108.    On this news, the price of the Company's stock fell $3.25 per share over the course of two trading sessions, or approximately 51.5%, from a closing price of $6.31 per share on March 11, 2025, to close at $3.06 per share on March 13, 2025.

## SUBSEQUENT DEVELOPMENTS

109.    In May 2025, after the conclusion of the Relevant Period, iRobot experienced a short squeeze—a sharp surge in its stock price driven largely by excessive short interest rather than

improvements in the Company's underlying fundamentals—following news that tariffs on United States' imports from the European Union would be postponed until July 2025.

110.    Despite the rise in stock price, market analysts continued to express serious concerns about iRobot's core business performance. For instance, on May 29, 2025, a *Seeking Alpha* analyst commented, in relevant part:

- iRobot's recent surge is likely a short squeeze driven by tariff relief news, but underlying fundamentals remain highly concerning.

- Technical indicators have turned bullish short-term, but the company's cash burn and deteriorating financials outweigh these positives.

- Q1 results revealed falling revenue, worsening losses, shrinking cash reserves, and declining gross margins, signaling severe operational stress.

- Despite a rock-bottom P/S ratio, I believe iRobot is a sell due to real bankruptcy risk and the likelihood of further dilution or debt.

## DAMAGES TO IROBOT

111.    As a direct and proximate result of the Individual Defendants' conduct, iRobot has lost and expended, and will continue to lose and expend, many millions of dollars.

112.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

113.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

115. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

116. As a direct and proximate result of the Individual Defendants' conduct, iRobot has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

117. Plaintiff brings this action derivatively and for the benefit of iRobot to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of iRobot, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

118. iRobot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

119. Plaintiff is, and has been at all relevant times, a shareholder of iRobot. Plaintiff will adequately and fairly represent the interests of iRobot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

120.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

121.    A pre-suit demand on the Board of iRobot is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Cohen, Golz, Loparco, Manolis, Miller, Mininberg, and Stacy (the "Director-Defendants") and non-party Neal Goldman (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

122.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

123.    As Board members of iRobot charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of iRobot, the Director-Defendants must have been aware of the material facts regarding the ineffectiveness of the Restructuring Plan and unlikelihood of achieving profitable operations without Amazon.

124.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted iRobot to issue materially false and misleading

statements. Specifically, the Director-Defendants caused iRobot to issue false and misleading statements which were intended to make iRobot appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

125.    Moreover, Defendants Golz, Manolis, Miller, and Stacy solicited the 2024 Proxy Statement, which called for a shareholder vote to, *inter alia*, reelect Defendant Manolis to the Board, allowing her to continue breaching her fiduciary duties to the Company.

126.    In addition, the Defendants Golz, Manolis, Miller, and Stacy caused the 2024 Proxy Statement to call for a shareholder vote to approve the Amended 2018 Plan, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended 2018 Plan, who would not have approved the Amended 2018 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Amended Stock Plan at the annual meeting of stockholders of Edwards on May 14, 2024, there were 363,566 shares available under the then-existing plan. After the shareholders approved the Amended 2018 Plan, 900,000 additional shares were made available under the plan (plus the remaining shares from the pre-existing plan) for a total of 1,263,566 remaining available under the plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the Amended 2018 Plan pursuant to the 2024 Proxy Statement. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

127.    Additional reasons that demand on Defendant Cohen is futile follow. Defendant Cohen has served as CEO and as a Company director since May 2024. The Company provides Defendant Cohen with his primary form of income. As such, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Cohen made many of the false and misleading statements alleged herein. Additionally, under the Amended 2018 Plan, Defendant Cohen is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. Moreover, Defendant Cohen is a defendant in the Securities Class Action. For these reasons, too, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Golz is futile follow. Defendant Golz has served as a Company director since November 2021. She also serves as the Chair of the Audit Committee. Defendant Golz receives handsome compensation for her role as a director. Additionally, Defendant Golz personally signed the 2024 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Golz solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of Defendant Manolis, allowing her to continue to breach her fiduciary duties to the Company, as well as the approval of the Amended 2018 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting

and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, under the Amended 2018 Plan, Defendant Golz is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Golz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

129.     Additional reasons that demand on Defendant Loparco is futile follow. Defendant Loparco has served as a Company director since August 2024. He also serves as a member of the Compensation and Talent Committee. Defendant Loparco receives handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, under the Amended 2018 Plan, Defendant Loparco is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Loparco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.     Additional reasons that demand on Defendant Manolis is futile follow. Defendant Manolis has served as a Company director since July 2019. She also serves as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Manolis receives handsome compensation for her role as director. Additionally, Defendant Manolis personally signed the 2024 10-K, which contained materially false and

misleading statements and omissions. Moreover, Defendant Manolis solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and led to her re-election, allowing her to continue to breach her fiduciary duties to the Company, as well as the approval of the Amended 2018 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, under the Amended 2018 Plan, Defendant Manolis is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Manolis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since September 2016. He has also served as the Chair of the Board since January 2024. Additionally, he serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Miller receives handsome compensation for his role as director. Additionally, Defendant Miller personally signed the 2024 10-K, which contained materially false and misleading statements and omissions. Moreover, Defendant Miller solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of Defendant Manolis, allowing her to continue to breach her fiduciary duties to the Company, as well as the approval of the Amended 2018 Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Amended 2018 Plan, Defendant Miller is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Mininberg is futile follow. Defendant Mininberg has served as a Company director since June 2024. He also serves as a member of the Audit Committee and as a member of the Compensation and Talent Committee. Defendant Mininberg receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Amended 2018 Plan, Defendant Mininberg is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Mininberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Stacy is futile follow. Defendant Stacy has served as a Company director since August 2014. She also serves as a member of the Nominating and Corporate Governance Committee and as the Chair of the Compensation and Talent Committee. Defendant Stacy receives handsome compensation for her role as a Company director. Additionally, Defendant Stacy personally signed the 2024 10-K, which contained

materially false and misleading statements and omissions. Moreover, Defendant Stacy solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of Defendant Manolis, allowing her to continue to breach her fiduciary duties to the Company, as well as the approval of the Amended 2018 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, under the Amended 2018 Plan, Defendant Stacy is eligible to receive stock awards under the Amended 2018 Plan, thereby materially benefiting from the adoption of the Amended 2018 Plan. For these reasons, too, Defendant Stacy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134.    Additional reasons that demand on the Board is futile follow.

135.    Defendants Golz (as current Chair), Miller, and Mininberg (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Defendant Miller served as Chair of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the

Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

136.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

137.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

138.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

139. The acts complained of herein constitute violations of fiduciary duties owed by iRobot's officers and directors, and these acts are incapable of ratification.

140. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of iRobot. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of iRobot, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

141. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause iRobot to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

142.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

145.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

146.    Under the direction and watch of the Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed;

and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

147.    The 2024 Proxy Statement also failed to disclose that: (1) iRobot exaggerated the effectiveness of the Restructuring Plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) consequently, iRobot was unlikely to achieve profitable operations as an independent entity; and (3) there was, therefore, significant doubt regarding the Company's ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

148.    In the exercise of reasonable care, Defendants Weinstein, Golz, Kao Manolis, Miller, and Stacy knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the re-election of Defendant Manolis to the Board and the approval of the Amended 2018 Plan.

149.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendant Manolis to the Board, thereby allowing her to continue breaching her fiduciary duties to the Company, and to approve the Amended 2018 Plan.

150.    The Company was damaged as a result of the Defendants Weinstein, Golz, Kao Manolis, Miller, and Stacy's material misrepresentations and omissions in the 2024 Proxy Statement.

151.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRobot's business and affairs.

154.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

155.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of iRobot.

156.    In breach of their fiduciary duties owed to iRobot, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) iRobot exaggerated the effectiveness of the Restructuring Plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) consequently, iRobot was unlikely to achieve profitable operations as an independent entity; and (3) there was, therefore, significant doubt regarding the Company's ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

157.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

158.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

159.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

160.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities.

161.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of iRobot's securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

162.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## THIRD CLAIM
### Against Individual Defendants for Unjust Enrichment

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, iRobot.

167.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from iRobot that was tied to the performance or artificially inflated valuation of iRobot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

168.    Plaintiff, as a shareholder and a representative of iRobot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

169.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused iRobot to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

172.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of iRobot in a manner consistent with the operations of a publicly held corporation.

176.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, iRobot has sustained and will continue to sustain significant damages.

177.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

178.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iRobot, for which they are legally responsible.

181.    As a direct and proximate result of the Individual Defendants' abuse of control, iRobot has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Cohen, Weinstein, Wong, and Zeiler for Contribution Under Sections 10(b) and 21D of the Exchange Act

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    iRobot and Defendants Cohen, Weinstein, Wong, and Zeiler are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these

violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Cohen's, Weinstein's, Wong's, and Zeiler's willful and/or reckless violations of their obligations as officers and/or directors of iRobot.

185.    Defendants Cohen, Weinstein, Wong, and Zeiler, because of their positions of control and authority as officers and/or directors of iRobot, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of iRobot, including the wrongful acts complained of herein and in the Securities Class Action.

186.    Accordingly, Defendants Cohen, Weinstein, Wong, and Zeiler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

187.    As such, iRobot is entitled to receive all appropriate contribution or indemnification from Defendants Cohen, Weinstein, Wong, and Zeiler.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of iRobot, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to iRobot;

(c)    Determining and awarding to iRobot the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing iRobot and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iRobot and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of iRobot to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding iRobot restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 12, 2025

THE BROWN LAW FIRM, P.C.

*/s/Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe

Zachary Benson
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net
        zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Anthony Wren, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17__ day of July, 2025.

DocuSigned by:

*Anthony Wren*
DA9A7E07421841D...
Anthony Wren